UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

|  |  |
|---|---|
| ERIC NGUYEN,<br><br>       Plaintiff,<br><br>v.<br><br>SUN LIFE ASSURANCE COMPANY OF CANADA,<br><br>       Defendant. | Case No. 3:14-cv-05295-JST (LB)<br><br>**ORDER ON JOINT DISCOVERY LETTER**<br><br>[ECF No. 30] |

### INTRODUCTION

This is an ERISA benefits-denial case. The assigned district judge has referred it to the undersigned to resolve a discovery dispute. Plaintiff Eric Nguyen was covered by an employee-benefits plan for which defendant Sun Life both served as the insurer and made the claims decisions. (*See* ECF No. 30 at 1.)[1] The plaintiff made claims under the plan for short-term and long-term disability benefits "based on upper[-]extremity pain syndromes, diagnosed as thoracic outlet syndrome . . . and other occipital, thoracic and cervical pain conditions." (*Id.*) Sun Life denied the plaintiff's claims "and upheld those denials on appeal." (*Id.*) The plaintiff has sued Sun Life to recover benefits under 29 U.S.C. § 1132(a)(1)(B).

---

[1] Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the tops of the documents.

ORDER (No. 3:14-cv-05295-JST (LB))

The administrative record, the material on which Sun Life made and then confirmed its decision, appears to consist mainly of the medical records, evaluations, and opinions of the plaintiff's numerous treating physicians. The plaintiff says that this material shows that he was disabled and entitled to benefits. The record also contains the opinions of four physicians whom Sun Life retained, as outside consultants, to review the plaintiff's claim; all four concluded that he was not disabled. (*See* ECF No. 30 at 5-7.)

The plaintiff now seeks to discover material beyond the administrative record. He has propounded interrogatories and requests for production to Sun Life, and proposes to take depositions. (ECF No. 30-1 to -4.) His proposed discovery covers three topics: 1) The completeness of the administrative record; 2) The "policies and guidelines" that Sun Life followed (or should have followed) in assessing his claim; and 3) The relationship between Sun Life and its four outside medical reviewers. (*See id.* at 5-7.) On the last point, the plaintiff wishes to discover material that he believes will show that the outside reviewers were "biased" in Sun Life's favor — essentially, because Sun Life paid them. (*See id.*)

The undersigned concludes that, under governing Ninth Circuit law, the plaintiff is not entitled to most of this discovery. (Exceptions are noted where appropriate in the Analysis below.) The plaintiff has not "clearly established" that evidence outside the existing administrative record is "necessary to conduct an adequate *de novo* review of the benefit decision." *See Opeta v. Nw. Airlines Pension Plan*, 484 F.3d 1211, 1217 (9th Cir. 2007) (emphasis removed). The undersigned therefore partly grants and partly denies the plaintiff's requested discovery.

\* \* \*

## GOVERNING LAW

The parties have stipulated that the district judge will review *de novo* Sun Life's decision to deny Mr. Nguyen benefits. (ECF No. 30 at 1.) Where *de novo* review applies, "no further preliminary analytical steps are required," and the district court "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (*en banc*); *accord Gonda v. Permanente Med. Group, Inc.*, 300 F.R.D. 609, 613 (N.D. Cal. 2014).

United States District Court
Northern District of California

This affects the range of permissible evidence. *De novo* review of an ERISA benefits denial is "based on the evidence in the administrative record and 'other evidence as might be admissible under the restrictive rule of *Mongeluzo* [*v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938 (9th Cir. 1995)].'" *Opeta*, 484 F.3d at 1217. In *Mongeluzo*, the Ninth Circuit "held that extrinsic evidence could be considered only under certain limited circumstances." *Opeta*, 484 F.3d at 1217. "[T]he district court should exercise its discretion to consider evidence outside of the administrative record '*only* when circumstances *clearly establish* that additional evidence is *necessary* to conduct an adequate *de novo* review of the benefit decision." *Id.* (quoting in part *Mongeluzo*, 484 F.3d at 944) (quoting in turn *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993) (*en banc*) (emphasis in *Opeta*).

Borrowing from *Quesinberry*, the Ninth Circuit in *Opeta* described "a non-exhaustive list of exceptional circumstances where evidence beyond the administrative record could be considered necessary":

> claims that require consideration of **complex medical questions** or issues regarding the **credibility of medical experts**; the availability of very limited administrative review procedures with little or no evidentiary record; the necessity of evidence regarding interpretation of the terms of the plan rather than specific historical facts; **instances where the payor and the administrator are the same entity and the court is concerned about impartiality**; claims which would have been insurance contract claims prior to ERISA; and circumstances in which there is additional evidence that the claimant could not have presented in the administrative process.

*Opeta*, 484 F.3d at 1217 (quoting *Quesinberry*, 987 F.2d at 1027) (emphases added).

Even where such circumstances exist, however, new evidence is not "required." *Quesinberry*, 987 F.2d at 1027. "A district court may well conclude that the case can be properly resolved on the administrative record without the need to put the parties to additional delay and expense." *Id.* As Judge Conti of this district observed: "[T]o further ERISA's policy of keeping proceedings inexpensive and expeditious, the Ninth Circuit has placed significant restrictions" — *i.e.*, the "narrow circumstances" outlined in *Opeta* — "on district courts' ability to consider evidence outside the administrative record." *Gonda*, 300 F.R.D. at 613 (citing *Mongeluzo*, 46 F.3d at 943). The Ninth Circuit itself has "emphasized" that "[i]n most cases only the evidence that was before the plan administrator at the time of determination should be considered." *Opeta*, 484 F.3d at 1217

ORDER (No. 3:14-cv-05295-JST (LB))

3

1    (quotation omitted).

2        These admissibility limits also constrain discovery:

3            The Ninth Circuit's decision in *Opeta* dealt with the issue of
             whether evidence outside the record is admissible rather than
4            whether the evidence is discoverable. Nevertheless, courts in this
             district have held that in light of *Opeta*'s limits on admissibility of
5            evidence in *de novo* cases and the ERISA's policy of keeping
             proceedings inexpensive and expeditious, it is appropriate to place
6            similar limits on discovery.

7    *Polnicky v. Liberty Life Ass. Co.*, No. C 13-1478 SI, 2014 U.S. Dist. LEXIS 29123, *5-*6 (N.D.

8    Cal. Mar. 15, 2014) (quoting in part *Rowell v. Aviza Tech. Health & Welfare Plan,* No. C 10-5656

9    PSG, 2012 U.S. Dist. LEXIS 16957, *13-14 n. 26 (N.D. Cal. Feb. 10, 2012) and citing *Knopp v.*

10   *Life Ins. Co. of N. Am.* C-09-0452 CRB (EMC), 2009 U.S. Dist. LEXIS 120267, *7 (N.D. Cal.

11   Dec. 28, 2009)); *accord Gonda*, 300 F.R.D. at 613 ("It makes little sense to allow broad and costly

12   discovery when the court's review of the merits is limited . . . ."); *see Brice v. Life Ins. Co. of N.*

13   *Am.*, No. C 10-4204 JSW, 2011 U.S. Dist. LEXIS 77525, *1 (N.D. Cal. Jul. 18, 2011) (ERISA's

14   goals of cost reduction and prompt claim disposition mean that "courts cannot allow discovery in

15   ERISA actions for the denial of benefits to be as broad . . . as in other types of cases").

16       The decision to allow extrinsic discovery under these rules lies in the court's discretion. *See*

17   *Opeta*, 484 F.3d at 1213.

18                                    *   *   *

19                                  **ANALYSIS**

20       The discussion below considers the plaintiff's requests, arranged by topic, in increasing order

21   of analytical complexity. Part 1 addresses the completeness of the administrative record; Part 2,

22   Sun Life's policies and guidelines. Part 3 discusses the complexity of the medical issues that this

23   case presents; it is an argument that the plaintiff raises but does not elaborate. Part 4 reaches the

24   harder question of the "bias" and lack of "credibility" that the plaintiff believes may have tainted

25   the work of Sun Life's outside medical reviewers. This last issue absorbs most of the plaintiff's

26   efforts here (*see* ECF No. 30 at 5-8); it is the issue on which district-court precedent, though

27   ostensibly following the same Ninth Circuit standard (*Opeta*), has divided most noticeably; and it

28   is this issue that has consumed most of the undersigned's thinking. The final Part 5 of this order

4

then turns back to explain the two most salient analytical considerations that guided the undersigned's decision on the issue of the outside reviewers' credibility. Essentially, Part 5 tries to explain why *Opeta* compels the conclusions reached on the record here, and why granting the requested discovery would depart, if not from the superficial, than from the substantive dictate of the Ninth Circuit's rule in this area.

*    *    *

### 1.  Completeness of the Administrative Record

The plaintiff does not directly dispute Sun Life's statement that it has "produced the entire Administrative Record." (*See* ECF No. 30 at 2.) He does ask for "any portions of his complete file in this matter [that have] not yet [been] provided." (*Id.* at 7.) "For instance," he writes, "Sun Life alleges that the administrative record contains communications with Mr. Nguyen's medical providers, however there is no evidence of Sun Life doctors contacting treating physicians in the record." (*Id.*)

There is no dispute that Sun Life "must produce the entire administrative record." *Duran v. Cisco Sys.*, 258 F.R.D. 375, 382 (C.D. Cal. 2009). More fully stated, "ERISA requires that claimants be given access to 'all documents, records, and other information relevant to the claimant's claim for benefits.'" *Bourland v. Hartford Life & Acc. Ins. Co.*, 2014 U.S. Dist. LEXIS 134813, *9 (W.D. Wash. 2014) (quoting in part 29 C.F.R. § 2650.503-1(h)(2)(iii)). Information is "relevant" in this context if it:

> i.  Was relied upon in making the benefit determination;
>
> ii.  Was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination;
>
> iii.  Demonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination; or
>
> iv.  In the case of a group health plan or a plan providing disability benefits, constitutes a statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination.

29 C.F.R. § 2650.503-1(m)(8); *Bourland*, 2014 U.S. Dist. LEXIS 134813 at *9-*10.

United States District Court
Northern District of California

The communications that the plaintiff mentions would seem to fall under at least two of these categories: material that was "relied on in making the benefit determination"; and material "generated in the course of making the benefit determination." If any such material exists and has not yet been produced to the plaintiff, including communication between Sun Life or its agents and the plaintiff's medical providers, that material is part of the administrative record and must be produced.

\* \* \*

### 2. Policies, Procedures, Guidelines

The plaintiff also "seeks the policies, procedures and guidelines applied to his claim." (ECF No. 30 at 8.) He correctly argues that ERISA regulations "require production of any 'internal rule, guideline, protocol, or other similar criterion' relied upon in making an adverse decision." (*Id.*) (quoting in part 29 C.F.R. § 2560.503-1(g)(v)(8)). The regulation reproduced earlier also covers this topic. Most generally, policies and guidelines may be "relied upon," or at least "considered," in "making the benefit determination." *See* 29 C.F.R. § 2560.503-1(m)(8)(i)-(ii). The same regulation compels production of material that constitutes a "statement of policy or guidance with respect to the plan concerning the denied . . . benefit . . . ." 29 C.F.R. § 2560.503-1(m)(8)(iv). Finally, the regulation makes "relevant" (and so mandates the production of) "information" that "[d]emonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section . . . ." 29 C.F.R. § 2560.503-1(m)(8)(iii). This "paragraph (b)(5)" mandates that a plan's "claims procedure" have "administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants." 29 C.F.R. § 2560.503-1(b)(5).

The plaintiff's "policies and guidelines" request elicits a three-pronged holding. First, insofar as ERISA regulations require Sun Life to give the plaintiff copies of relevant policies and guidelines, and to the extent that Sun Life has not already produced this material, it is ordered to do so. *See Knopp*, 2009 U.S. Dist. LEXIS 120267 at *10-*11; *Bourland*, 2014 U.S. Dist. LEXIS 134813 at *8-*10; *Polnicky*, 2014 U.S. Dist. LEXIS 29123 at *11-*12 (citing *Knopp*, *supra*, and

United States District Court
Northern District of California

*Rowell*, 2012 U.S. Dist. LEXIS 16957 at *11).

Second, beyond the policy documents themselves, the plaintiff is not entitled to extra-record discovery into whether and why Sun Life followed, or failed to follow, its own policies and guidelines in assessing the plaintiff's claims. As multiple courts have noted, this is irrelevant on *de novo* review. Another judge in this district recently wrote: "Even if Defendants failed to follow claim procedures or guidelines, that failure might reflect upon the integrity and accuracy of the administrator's review of [the plaintiff's] disability claim, but that review is entitled to no deference on *de novo* review and is therefore irrelevant." *Knopp*, 2009 U.S. Dist. LEXIS 120267 at *10; *accord Polnicky*, 2014 U.S. Dist. LEXIS 29123 at *11-*12 (calling irrelevant to *de novo* review whether administrator "took a more aggressive approach" under its policies and guidelines to avoid paying "high benefit amount"); *cf. Gonda*, 300 F.R.D. at 315 ("fail[ing] to see relevance" of policies and history of policy changes). (The only limitation on this may lie in 29 C.F.R. § 2560.503-1(b)(5) and (m)(8)(iii). Those subsections compel the production of information that "[d]emonstrates compliance with the administrative processes and safeguards" employed "to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants." If Sun Life has documentary material responsive to that limited requirement, it must produce it.)

Third, the plaintiff rolls into his request for policies and guidelines material concerning "Sun Life's relationships with third[-]party reviewers." (ECF No. 30 at 8.) For the reasons set out in Part 4, below, the plaintiff is not entitled to investigate the "bias" or "credibility" of Sun Life's outside consultants. (At least he may not go beyond the existing administrative record to make that investigation.) The material that is barred from discovery under the discussion below cannot be obtained through the side door by asking for "policies and guidelines." If the "policies and guidelines" describe general administrative rules governing how and when Sun Life uses third-party medical reviewers, that material may be discoverable.[2] Most of what the plaintiff has asked

---

[2] This seems to be the information the plaintiff has in mind when he points to the "written discovery" of "procedures for oversight of third[-]party reviewers" that the court allowed in *Eisner*

United States District Court
Northern District of California

for, however, in connection with "Sun Life's relationships with third[-]party reviewers" — such as how many times Sun Life has hired a specific consultant (ECF No. 30-2 at 5-6), how much Sun Life has paid them (ECF No. 30-1 at 6-8; ECF No. 30-2 at 5-6), and the contracts embodying these things (ECF No. 30-1 at 6-7) — would not constitute "policies" or "guidelines" discoverable under this part of the analysis.

A particular word is needed concerning the plaintiff's fourth Request for Production. The plaintiff discusses this request in connection with "policies and guidelines." (ECF No. 30 at 8.) On its face, though, it asks for material that would seem to be protected under the attorney-client privilege or the attorney work-product doctrine. (*See* ECF No. 30-1 at 5.)[3] The plaintiff argues that such material "fall[s] outside the attorney[-]client privilege under the fiduciary exception." (ECF NO. 30 at 8.) The issue is moot: to this request, Sun Life answers that there are "no responsive documents." (*Id.* at 3.)

\* \* \*

In sum, insofar as ERISA regulations require Sun Life to produce its policies and guidelines, and to the extent that those have not yet been produced, Sun Life must produce them. The plaintiff cannot obtain discovery (beyond the administrative record itself) into whether Sun Life did or did not follow its policies and guidelines in handling his claims. Nor is the plaintiff entitled to extrinsic discovery into Sun Life's relationship with the outside medical reviewers that it hired to review the plaintiff's claims, as discussed in Part 4, below.

\* \* \*

## 3. Complex Medical Questions

The plaintiff briefly suggests that "this is a complicated medical case, given the overlapping and comorbid conditions suffered by Mr. Nguyen, the many surgeries he has undergone over the years, and the copious records describing intricate medical procedures." (ECF No. 30 at 6.)

---

*v. Prudential Ins. Co. of Am.*, No. 12-cv-01238-JST, 2013 U.S. Dist. LEXIS 65090 (N.D. Cal. May 4, 2013). (*See* ECF No. 30 at 8.)

[3] The fourth RFP asks for: "Any and all DOCUMENTS evidencing any and all attorney-client COMMUNICATION and attorney memoranda, guidelines and opinions RELEVANT to the CLAIMS at any time before the adverse decision." (ECF No. 30-1 at 5) (capitals original).

Presumably, the plaintiff means to invoke *Opeta's* category of situations in which "complex medical questions" permit extrinsic discovery. *See Opeta*, 484 F.3d at 1217. The court does not think that the facts, or the plaintiff's fleeting glance off this topic, justifies discovery under *Opeta*.

The court does not doubt that this case involves complex medical issues. But there seems to be ample record proof from which the district judge can adequately review Sun Life's decision. The administrative record (according to Sun Life; and the plaintiff does not dispute this) contains over 6000 pages of documents. (*See* ECF No. 30 at 2.) By the plaintiff's description, the record comprises an "avalanche" of material from "dozens" of physicians supporting his claim (ECF No. 30 at 5-6) — and, of course, it contains the contrary assessments of Sun Life's third-party medical reviewers.

The plaintiff does not elaborate his "complicated medical case" point. He does not explain how the material already in the record fails to elucidate any particular medical issue, or how the existing record otherwise lacks information that a court would need to decide for itself whether he was disabled. To the contrary, the plaintiff's own argument suggests that the existing administrative record permits a decision in his favor. He cites "copious records describing intricate medical procedures." (ECF No. 30 at 6.) He calls Sun Life's adverse decision "incredible" given the "thoroughly documented medical support by [his] treating physicians." (*Id.* at 5.) And he describes "the support of *dozens* of doctors who have personally treated him — an *avalanche of gold-standard support* by . . . specialists who have *clinically demonstrated the objective and subjective severity of his conditions*." (*Id.* at 6) (emphasis added). In other words, it is not that the plaintiff feels the existing record inadequate to support a *de novo* decision; he just thinks that it supports a decision in his favor.

The plaintiff has not "clearly established" that, because of "complex medical questions," evidence beyond the administrative record is "necessary" for an adequate *de novo* review of his claim.

*   *   *

United States District Court
Northern District of California

**4**.  **Sun Life's Relationship With Outside Medical Reviewers**

The heart of the plaintiff's discovery requests asks to delve into information concerning the relationship between Sun Life and the outside medical consultants that the insurer hired to review (and who ultimately suggested denying) his claim. (*See* ECF No. 30-1 at 5-8; ECF No. 30-2 at 5-8.) With these requests the plaintiff asks Sun Life to produce material reflecting (for example) how many times it has hired the medical reviewers in the past five years, how much it has paid them, how many times it has denied claims based on their opinions, evaluations it has made of their work, and the contracts reflecting their employment. The plaintiff would also depose Sun Life on these points. (ECF No. 30-3 at 5; ECF No. 30-4 at 6-7.)

\* \* \*

**4.1 Structural Conflict of Interest & Impartiality**

Again, "Sun Life was the insurer for the Plan and made the claims decisions." (ECF No. 30 at 1.) It both paid the claims, in other words, and decided which claims would be paid. Sun Life thus had what the case law calls a "structural conflict of interest." *See, e.g., Tarasovsky v. Stratify, Inc.*, No. C 11-03359 WHA, 2012 U.S. Dist. LEXIS 69921, \*14 (N.D. Cal. May 18, 2012) (quoting *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 630-31 (9th Cir. 2009)); *Nolan v. Heald College*, 745 F. Supp. 2d 916, 921 (N.D. Cal. 2010). Such a conflict exists whenever the "same entity that funds an ERISA plan also evaluates claims." *Tarasovsky*, 2012 U.S. Dist. LEXIS 69921 at \*14; *accord, e.g., Nolan*, 745 F. Supp. 2d at 921. Because the plan administrator in such a case "is also the insurer, . . . by denying benefits, the administrator retains money for itself." *Montour*, 588 F.3d at 630. In *Opeta*, the Ninth Circuit recognized this as an "exceptional circumstance[]" in which additional evidence "could be considered necessary." *Opeta*, 484 F.3d at 1217 ("where the payor and the administrator are the same entity and the court is concerned about impartiality").

The plaintiff invokes this ground to bolster his primary claim that Sun Life's outside medical reviewers were biased. He writes that *Opeta* permits extrinsic discovery in *de novo* cases that present "'issues regarding the credibility of medical experts,' *particularly involving a conflict of interest* such as in this case, where Sun Life acts as both the claims decision maker and plan funder." (*See* ECF No. 30 at 5) (quoting in part *Opeta*, 484 F.3d at 1217) (emphasis added).

The court does not think that, merely by pointing to Sun Life's dual role as plan administrator and payer, the plaintiff has "clearly established" that additional discovery is "necessary" to an "adequate *de novo* review of the benefits decision." Two points might be made here.

First, Sun Life's "structural conflict of interest" does not alone warrant extrinsic discovery. *See Bourland*, 2014 U.S. Dist. LEXIS at *6 ("Under *de novo* review, [the insurer's] alleged conflict of interest is irrelevant."); *Abatie*, 458 F.3d at 963 (*de novo* review asks whether benefits were correctly denied, "without reference to whether the administrator operated under a conflict of interest"). Defendants in ERISA cases have often served as both plan administrator and plan funder. The situation appears to be common. That a defendant acted as both administrator and payer thus cannot qualify, on its own, as an "exceptional circumstance" under *Opeta's* "restrictive" rule. The *Gonda* court, in this vein, refused to accept the notions that "discovery on an insurer's conflict of interest is always permissible or that a conflict of interest has any direct bearing on the merits analysis in a *de novo* review." *Gonda*, 300 F.R.D. at 614 (discussing *Waggener v. Unum Life Ins. Co. of Am.*, 238 F. Supp. 2d 1179 (S.D. Cal. 2002)). Other cases have similarly held that a plan administrator's motives are "irrelevant" on *de novo* review. *See Knopp*, 2009 U.S. Dist. LEXIS 120267 at *10 (denying discovery into insurer's conflict of interest); *Bourland*, 2014 U.S. Dist. LEXIS 134813 at *6. The undersigned largely agrees. The question on *de novo* review is generally not *why* the insurer reached the decision it did — whether from misanthropy, incompetence, or a miserly grip on "its" funds. The *de novo* question is more direct; it is "simply" whether, given the administrative record, the plaintiff was entitled to benefits. *See, e.g., Abatie*, 458 F.3d at 963.

Second, it is far from clear that an insurer's "structural conflict of interest" speaks to whether outside medical reviewers "biased" their own decisions in favor of the plan administrator. The link that the plaintiff draws between the two (*see* ECF No. 30 at 5) is too casual, in any case, does not hold up to closer analysis, and does not justify additional discovery under *Opeta*. The court is aware that one decision took an approach similar to the plaintiff's on this point. In *Knopp*, too, the court linked the issues of outside-reviewer bias and the plan administrator's structural conflict of interest:

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> [T]he Court concludes that Ms. Knopp has made an adequate showing that she is entitled to some discovery which could bear directly and substantially on the credibility of the medical reviewers engaged by the insurer, issues *potentially enhanced by the potential conflict of interest* here — the insurer/payor and plan administrator appear to be affiliated with each other.

*Knopp*, 2009 U.S. Dist. LEXIS 120267 at *8-*9 (emphasis added). *Knopp* then ordered the defendants to produce any "performance evaluations" of and, more generally, "information about the [outside] medical consultants," "including their relationship with Defendants"; the court called the latter material "closely related to the issue of conflict of interest." *Id.* at *8.

The undersigned respectfully disagrees with this aspect of *Knopp*. An insurer's conflict of interest, on the one hand, and the "bias" and "credibility" of outside reviewers, on the other, are distinct issues. Doctrinally, *Opeta* does not link medical-reviewer "credibility" to a plan administrator's "conflict of interest." *See Opeta*, F.3d at 1217-18. *Opeta* does not suggest that the latter enhances the former, so that cases involving a "structural conflict of interest" more readily admit of extrinsic discovery into the "credibility" of outside medical reviewers. *See id.* The plaintiff's contrary suggestion (ECF No. 30 at 5) is inaccurate.

Logically, too, there is no decisive link from one party's self-interest to another's credibility. That is to say, from Sun Life's structural incentive to minimize benefit payments it does not follow that its outside consultants distorted their assessments to favor the insurer. The two phenomena are distinct. The *Gonda* court thus rightly observed that an insurer's "purported conflict of interest has little or no bearing on whether [a] Plaintiff can introduce extra-record evidence concerning the credibility of" third-party "physicians . . . retained . . . to review [the] Plaintiff's claims." *Gonda*, 300 F.R.D. at 616 n. 3.

Obviously, there may be "exceptional" cases in which these things are tied; for example, where an insurer, driven by a virulent self-regard, so distorts its obligation to rightly handle benefits claims that it hires only those consultants who knowingly warp their own conclusions to protect their paymaster's treasury. But this cannot be deemed the ordinary case — particularly in view of the "restrictive" *Opeta* standard that bounds this whole inquiry. A case cannot fall into *Opeta's* "exceptional" class of "credibility" cases simply because there exists a garden-variety "structural conflict of interest."

1    Sun Life's "structural conflict" alone does not suggest — much less "clearly establish" — that

2    its outside consultants were "biased" or otherwise lacked "credibility" so as to warrant

3    "exceptional" discovery beyond the administrative record.

4                                              *   *   *

5    **4.2 Third-Party Medical Reviewers' Credibility and Bias**

6        We now reach the point on which the plaintiff puts the most weight: the notion that, because

7    the insurer paid them and perhaps had hired them in other cases, the third-party physicians whom

8    Sun Life hired to review the plaintiff's medical records were "biased" in Sun Life's favor. The

9    plaintiff writes that the conclusion that Sun Life's four outside consultants reached (in sum, that he

10   was not disabled) is contrary to the weight of the administrative record — meaning the records,

11   reports, and opinions of the plaintiff's "dozens" of treating physicians. The consultants'

12   "incredible" opinions provide "clear evidence of [their] bias and lack of credibility," in the

13   plaintiff's view, and so justify additional discovery under *Opeta*. (ECF No. 30 at 5-7.)

14       The court disagrees. That these reviewers reached conclusions different from those reached by

15   the plaintiff's treating physicians does not stand as evidence that the outside physicians were

16   biased in Sun Life's favor, much less that they "clear[ly]" lack credibility. This is true even if, as

17   the plaintiff suggests, the reviewers' reasoning and opinions cut against the overwhelming weight

18   of the administrative record. That would not mean that they distorted their work to serve Sun

19   Life's financial interests. It would not mean that they "summarily ignored" (ECF No. 30 at 6) the

20   plaintiff's existing medical records. That their opinions do not jibe with the opinions of "dozens"

21   of the plaintiff's own physicians means only that they took a minority view. A view, perhaps, with

22   little support in the wider administrative record. These last points might in turn suggest, at most,

23   that Sun Life's reviewers are incorrect. Not biased, or lacking credibility, but wrong. A *de novo*

24   review can account for all this without imagining that the reviewers were shills who warped their

25   analyses to serve Sun Life's pecuniary interests. All the items that the plaintiff cites as indicating

26   "bias" and "lack of credibility" (ECF No. 30 at 6) really just take issue with the soundness of the

27   medical reviewers' reasoning or the rightness of their conclusions.

28       The plaintiff 's argument at the hearing on this matter confirmed this last point. The plaintiff

United States District Court
Northern District of California

1   there urged that what was "exceptional" about this case, and what demonstrated the medical

2   reviewers' bias, was that they had summarily dismissed or just "ignored" what the plaintiff

3   considers to be "gold standard" support demonstrating that he has thoracic outlet syndrome. The

4   proposed deposition could inquire into that bias — or, more precisely, into why the reviewers had

5   "ignored" decisive material. Which is to say that the plaintiff would not inquire into the reviewers'

6   "bias," so much as invoke that putative bias to justify a further inquiry into the soundness of their

7   reasoning and conclusions. But, judging again from the plaintiff's own statements, the existing

8   record should provide enough information from which the district court may assess the reviewers'

9   substantive work and reach its own *de novo* decision on whether the plaintiff is disabled.

10  Furthermore, consider the plaintiff's likely position if he were allowed to depose Sun Life's

11  consultants — and these consultants elaborated defenses of their work. Would the plaintiff

12  consider that material as outside the administrative record and thus beyond consideration? At all

13  lengths, the plaintiff's "bias" argument seems a dispute with the quality of the reviewers' work.

14      The plaintiff sees the bias as stemming from the fact that Sun Life *paid* these outside

15  reviewers. (*See* ECF No. 30 at 5-7.) These "paid consultants," the plaintiff writes, were "hired to

16  render opinions that support Sun Life's terminations. Accordingly, additional discovery is

17  necessary to investigate and expose the extent of this bias and its effect on the credibility,

18  objectivity, and thus *reliability* of their opinions . . . ." (ECF No. 30 at 7) (emphasis in original).

19      The court again disagrees. The court sees better reasoning in those decisions holding that mere

20  compensation does not itself justify extrinsic discovery under *Opeta's* "credibility of medical

21  experts" head. *See Polnicky*, 2014 U.S. Dist. LEXIS 29123 at *7 ("mere fact that a physician

22  receives compensation from a plan administrator for performing medical reviews is insufficient by

23  itself to be probative of bias") (citing *Lavino v. Metro. Life Ins. Co.*, 779 F. Supp. 2d 1095, 1104

24  (C.D. Cal. 2011), *Nolan*, 745 F. Supp. 2d at 923, *Kludka v. Qwest Disability Plan*, No. CV-08-

25  1806, 2010 U.S. Dist. LEXIS 34572, *2 (D. Ariz. Apr. 7, 2010), and *Brice*, 2011 U.S. Dist. LEXIS

26  77525, at *3. The plaintiff does not challenge the reviewers' qualifications; nor does he point to

27  misrepresentations or similar problems in their work. *See Polnicky*, 2014 U.S. Dist. LEXIS, at *7-

28  *8; *Brice*, 2011 U.S. Dist. LEXIS 77525, at *3. He does not show that they were biased, or

United States District Court
Northern District of California

14

ORDER (No. 3:14-cv-05295-JST (LB))

otherwise lack credibility, to warrant additional discovery under *Opeta*.

Some cases have reached a different conclusion. Facing essentially the same "bias" and "credibility" arguments that the plaintiff makes here, these cases have held that *Opeta* sanctions additional discovery into the relationship between a plan administrator and its outside medical reviewers, "because it goes to the weight the court will assign those [reviewers'] opinions in its *de novo* review." *Rowell*, 2012 U.S. Dist. LEXIS 16957, at *11; *accord Gonda*, 300 F.R.D. at 614-15; *Bourland*, 2014 U.S. Dist. LEXIS 134813, at *7; *Reynolds v. UNUM Life Ins. Co. of Am.*, No. 2:10cv2383, 2011 U.S. Dist. LEXIS, *3 (D. Ariz. Aug. 12, 2011); *see also Eisner*, 2013 U.S. Dist. LEXIS 65090 at *4-*9 (analyzing outside *Opeta*). But *Opeta's* mandate to limit additional discovery to "exceptional circumstances," including on the issue of medical-reviewer credibility, leads the undersigned to a different view. This points to a more general consideration of *Opeta's* rule and the way in which it has guided this decision. That consideration occupies the last part of this analysis.

*   *   *

## 5.  Key Analytical Points

Two operative points have guided the conclusions reached above, especially on the issues of Sun Life's "structural conflict of interest" and the possible "bias" of its outside medical reviewers. The first point is that *Opeta* must be taken at its "restrictive" word. "Exceptional circumstances" cannot too readily be found without nullifying *Opeta*. The second is that the directness of a *de novo* review obviates most extra-record discovery into the motives and putative shortcomings of those who assessed the plaintiff's benefits claims. In circumstances like the present, at least, further inquiry into such matters is not "clearly . . . necessary" to a *de novo* review.

*   *   *

### 5.1 *Opeta* Must be Applied "Restrictively"

There is tension in the heart of *Opeta*. On the one hand, to advance ERISA's goals of keeping claims procedures prompt and inexpensive, *Opeta* expressly describes a "restrictive" standard, under which discovery beyond an administrative record may be allowed "only" in "limited" and "exceptional circumstances." *Opeta*, 484 F.3d at 1217. The *de novo* plaintiff who seeks such

ORDER (No. 3:14-cv-05295-JST (LB))

United States District Court
Northern District of California

discovery must "clearly establish[]" that extrinsic evidence is "*necessary* to conduct an adequate *de novo* review of the benefit decision." *Id.* (emphasis in original). Even then, a court may conclude that further discovery is not "required." *Quesinberry*, 987 F.2d at 1027. "In most cases," the Ninth Circuit has "emphasized," "only the evidence that was before the plan administrator at the time of determination should be considered." *Opeta*, 484 F.3d at 1217 (quotation omitted).

On the other hand, *Opeta* counts among the "exceptional circumstances" that "could" warrant extrinsic discovery situations that arise frequently. As we have already noticed, defendants in ERISA benefits-denial suits have often served as both plan administrator and plan funder, setting up the "structural conflict of interest" that might cause a court to question the insurer's "impartiality" in denying benefits. *See id.* Furthermore, judging from the case law, ERISA plan administrators often hire third-party physicians to assess claimants' cases. No one would expect such consultants to work for free, and the fact that they are paid, and are perhaps employed repeatedly by the same administrator, will reliably prompt ERISA plaintiffs to challenge their opinions as "biased" and lacking "credibility." *See id.*

This tension between *Opeta's* ostensibly "restrictive" rule and the common situations that it describes has led district courts to contradictory decisions. Thus, some cases have agreed that an insurer's structural conflict justifies extrinsic discovery (*see Knopp*), while others have held that conflict irrelevant to *de novo* review (*Gonda*). Decisions have split more numerously over whether to permit additional discovery into the "bias" and "credibility" of paid outside medical reviewers. Some cases have swiftly concluded that such evidence would help the *de novo* court to weigh the reviewers' opinions (*e.g., Rowell*); while others — correctly, in the undersigned's view — hold that the mere fact of compensation does not alone raise sufficient "credibility" issues under *Opeta*, and that the directness of the *de novo* inquiry makes such considerations irrelevant (*e.g., Polnicky*).

The undersigned thinks that *Opeta* must be taken at its "restrictive" word. If it justified extrinsic discovery merely to note the existence of a structural conflict of interest, or to observe that consultants were paid, then the situations in which *Opeta* authorizes such discovery would be routine rather than "exceptional." *Opeta* would erase its own rule. The undersigned thus respectfully concludes that decisions permitting such discovery — once a claimant points to a

United States District Court
Northern District of California

"structural conflict of interest," or wonders if an outside reviewer is "biased" and lacks

"credibility" because the plan administrator paid for her opinion — drift away from *Opeta's*

explicitly "limited" rule. A plaintiff who wants discovery beyond the existing administrative

record in a *de novo* case must point to something more than a mere structural conflict of interest or

the fact of compensation to third-party medical reviewers. That is more in keeping with the letter

and substance of *Opeta*.

\* \* \*

### 5.2 *De novo* review obviates most discovery into "conflict" and "bias"

Adhering closely to *Opeta's* "significant restrictions," *Gonda*, 300 F.R.D. at 613, is also

consistent with the (perhaps more basic) insight that a *de novo* review, by its nature, need not

concern itself with the motives of plan administrators or their paid third-party medical reviewers.

The only question on *de novo* review, as we have repeatedly said, is "simply . . . whether the plan

administrator correctly or incorrectly denied benefits." *Abatie*, 458 F.3d at 963. *Why* the

administrator reached a putatively incorrect decision — whether because its self-interest inclined it

to hold on to funds; or because it relied on the "biased" opinions of lackey consultants — that

question is supplanted and made "irrelevant" by the directness and simplicity of the *de novo*

inquiry.

Going further, one can say that *de novo* review can account for (and not merely avoid) some

issues that often lead ERISA plaintiffs to seek additional discovery. Consider *Tarasovsky*, *supra*,

which both parties cite. There, too, a plan administrator's outside reviewers concluded that the

plaintiff was not disabled. *See Tarasovsky*, 2012 U.S. Dist. LEXIS 69921 at *1-*2, *6-*9. The

*Tarasovsky* court denied summary judgment (to both parties) partly because the administrative

record left "unanswered questions" about the relationship between the insurer and its outside

reviewers. *Id.* at *15-*19. "The unknown connection" between the defendant and its consultants,

*Tarasovsky* reasoned, was "especially concerning . . . where so many other physicians concluded

that [the] plaintiff was disabled." *Id.* at *16. The plaintiff here draws a parallel to *Tarasovsky*; he

argues that Sun Life's outside reviewers found no disability despite an "avalanche" of proof from

his treating physicians. (ECF No. 30 at 6.) This impugns the reviewers' *bona fides*, in the

plaintiff's view, so that further discovery should be allowed into the "connection" between Sun Life and its consultants. (*See id.*)

That is the wrong conclusion. First, *Tarasovsky* used a different legal standard. Though it declined to decide which standard applied to its merits review, *Tarasovsky* effectively used the "more complex" variant of the abuse-of-discretion standard. *See Tarasovsky*, 2012 U.S. Dist. LEXIS 69921 at *11-*15. That review is conceptually wider-ranging than *de novo* review. *See id.* (discussing *Montour*, 588 F.3d at 629-31). Under the "more complex" inquiry, "all the facts and circumstances" surrounding a benefits decision "must be considered"; unlike *de novo* review, this innately admits of inquiry into how the administrator's or its consultants' motives affected that decision. *See id.* at *13-*15. Thus, a court conducting a "complex" abuse-of-discretion analysis "may consider evidence beyond that contained in the administrative record." *Id.* at *15 (quoting *Abatie*, 458 F.3d at 970). But that is not our case. Second, the *de novo* standard that applies here can substantively account for the fact that paid consultants reach decisions that go against the weight of the administrative record. As we observed earlier, in deciding whether a benefit decision was correct, a *de novo* court can consider the facts that Sun Life's outside medical reviewers took a minority position, and that (according to the plaintiff) their opinions find little or no support in an "avalanche" of record material. The *de novo* review can, in this way, account directly for the contrarian position of Sun Life's consultants without imagining that they or Sun Life acted from improper motives, and without launching additional discovery into those essentially ancillary questions.

Consider too the case of *Barteau, supra*. The plaintiff writes that *Barteau* "found evidence regarding claims[-]reviewer bias necessary to its *de novo* review." (ECF No. 30 at 7 (citing *Barteau*, 2009 U.S. Dist. LEXIS at *52). (The word "necessary" is a bit of an overstatement; *Barteau* did not mention *Opeta's* "necessary" limitation but instead wrote that "when the evidence in question pertains to the bias of the reviewing physician, such evidence is permitted under a *de novo* standard of review." *Id.*) The *Barteau* court did consider extrinsic evidence into whether the insurer-administrator's outside consultant "was an advocate for" the insurer. *Id.* The present point is to notice that *Barteau* need not have done so to carry out its *de novo* review; or, more to the

United States District Court
Northern District of California

1    point, that the present plaintiff need not obtain additional discovery to address the similar

2    problems he perceives in the work of Sun Life's third-party consultants. The *Barteau* court was

3    concerned that the insurer's medical reviewer had reached conclusions contrary to the plaintiff's

4    historical medical records, that his analysis was internally inconsistent, and that he proffered

5    statements that were flatly incorrect. *See id.* at *26-*28. The plaintiff here makes similar

6    complaints about the work of Sun Life's consultants. (ECF No. 30 at 5-6.) But these challenges do

7    not justify a new investigation into the motives of Sun Life's reviewers. Assume that the plaintiff

8    is correct in all that he says about the outside reviewers' reasoning and conclusions. The *de novo*

9    inquiry can account for all this directly. If a medical reviewer seems to have "summarily

10   ignore[d]" a wealth of existing information; if his analysis is internally inconsistent; if he proceeds

11   under factual statements that are demonstrably incorrect — all this can weigh into whether, on *de*

12   *novo* review, the district court concludes that the reviewer, and the insurer who relied on his

13   opinions, "correctly or incorrectly denied benefits." Invoking such concerns, in other words, does

14   not "clearly establish" that additional discovery is "necessary" to an "adequate" *de novo* review.

*   *   *

16      The undersigned thinks that, in light of *Opeta's* "restrictive" standard, and ERISA's concern

17   that claims be resolved inexpensively and expeditiously, it cannot be too quick to perceive

18   "exceptional circumstances" that permit discovery beyond the administrative record. Particularly

19   where *de novo* review, being direct, negates or accounts in its own way for many such problems.

20   This "restrictive" approach is more than consistent with *Opeta*; it ensures the basic integrity of

21   *Opeta's* framework and rule, which otherwise threatens to swallow itself.

22      The plaintiff has pointed only to the existence of a structural conflict and the fact that Sun Life

23   paid its outside medical reviewers. From those facts he then offers his suspicion and suggestion

24   that Sun Life and the outside reviewers may have reached their conclusions from inappropriate

25   motives. He has not "clearly established" that discovery into these matters is "necessary" to an

26   adequate *de novo* review.

27      *   *   *

28

United States District Court
Northern District of California

**CONCLUSION**

The decision whether additional discovery is warranted in an ERISA benefits-denial case is discretionary and contextual. If *Opeta* means what it says, then it applies to only "exceptional circumstances," where further discovery is "clearly . . . necessary" to an adequate *de novo* review, and not to "most cases." But the pertinent circumstances here are not exceptional. They are ordinary. The ultimate question is whether the administrative record gives the district court enough information to decide *de novo* whether the plaintiff is entitled to benefits. For the reasons discussed throughout this order, the existing record here does provide enough information to make that decision.

The court thus partly grants and partly denies the plaintiff's requested discovery. Sun Life is ordered to produce the material described in the foregoing order and summarized as follows:

Sun Life must produce any parts of the administrative record, defined as "relevant" under the applicable ERISA regulations, that have not yet been given to the plaintiff. *See supra*, Analysis, Part 1.

Insofar as ERISA regulations require Sun Life to produce the policies and guidelines that applied to the plaintiff's claims, and to the extent that those have not yet been produced, Sun Life is ordered to produce them. Beyond the policy documents, the plaintiff cannot obtain further discovery into whether Sun Life followed its policies and guidelines in handling his claims. If Sun Life has any material that "demonstrates [its] compliance with the administrative processes and safeguards" required for the specific purposes of 29 C.F.R. § 2560.503-1(b)(5), it must produce that material. *See supra*, Analysis, Part 2.

The plaintiff is not entitled to additional discovery into Sun Life's relationship with the third-party medical reviewers that it hired to assess the plaintiff's claims. *See supra*, Analysis, Part 4.

The plaintiff will not be permitted to conduct depositions on any of this material. *Cf. Johnson Leung v. Cigna Life Ins. Co. of N. Am.*, 2011 U.S. Dist. LEXIS 9109, *7 (N.D. Cal. Jan. 24, 2011) ("Depositions are generally not warranted or approved.") (abuse-of-discretion case).

**IT IS SO ORDERED.**

Dated: October 27, 2015



_____

LAUREL BEELER
United States Magistrate Judge